# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:_____**

**Filing Date: February 12, 2018**

**NO. S-1-SC-36009**

**STATE OF NEW MEXICO PUBLIC**
**EDUCATION DEPARTMENT, and**
**VERONICA GARCIA, Secretary of Education,**

  Respondents-Petitioners,

v.

**ZUNI PUBLIC SCHOOL DISTRICT, #89,**

  Petitioner-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Grant L. Foutz, District Judge**

Sutin, Thayer & Browne, P.C.
Susan M. Hapka
Albuquerque, NM

State of New Mexico Public Education Department
Dawn E. Mastalir
Santa Fe, NM

for Respondents-Petitioners

VanAmberg, Rogers, Yepa, Abeita & Gomez, LLP
Ronald J. VanAmberg
Carl Bryant Rogers

Santa Fe, NM

for Petitioner-Respondent

**OPINION**

**MAES, Justice.**

{1}     The State of New Mexico (State), through the Public Education Department (Department), provides operational funding to public schools in the form of state equalization guarantee distribution payments (SEG distribution payments). Some school districts also receive federal funding under the Impact Aid Act, for which the Department reduces SEG distribution payments to the district in the amount of seventy-five percent of the impact aid received. *See* Impact Aid Act, 20 U.S.C. §§ 7701-7714 (2017 Supp.); NMSA 1978, § 22-8-25(C)(2), (D)(5), (D)(6) (2017). In this case, we determine when the Department may take into consideration federal impact aid payments a school district receives, or is anticipated to receive, in the Department's allocation of SEG distribution payments to the district during the fiscal year. We hold that the Department may not reduce SEG distribution payments to a district based on anticipated impact aid payments or payments actually received until the State has received certification from the Secretary of the United States Department of Education (DOE Secretary) or the State has obtained permission from the DOE Secretary to consider impact aid prior to certification. Once the State has received its certification from the DOE Secretary, the certification shall apply retroactively to any impact aid payments received by the district during the entire

fiscal year.

## I. BACKGROUND

## A. New Mexico Public School Funding Process

{2} Under the Public School Finance Act, NMSA 1978, §§ 22-8-1 to -48 (1967, as amended through 2017), the Department is obligated to ensure that each public school district is provided with enough operating revenue to meet the cost of the district's program each fiscal year.[1] "A key feature of New Mexico's public school operational funding scheme is the state equalization guarantee distribution, which is a formula through which the [s]tate apportions federal and local revenue for schools equitably among the state's school districts." *Zuni Pub. Sch. Dist., No. 89 v. N.M. Pub. Educ. Dep't*, 2012-NMCA-048, ¶ 3, 277 P.3d 1252, (*Zuni I*) (alteration in original) (internal quotation marks and citation omitted). The purpose of the formula is to "equalize per-pupil expenditures throughout the State," and provide every child with an equal opportunity for education in New Mexico. *Zuni Pub. Sch. Dist., No. 89 v. Dep't of Educ.*, 550 US. 81, 85 (2007).

{3} The state equalization guarantee distribution (SEG distribution) is the amount of money provided by the State to the district to cover the district's program cost. *See*

---

[1]The fiscal year at issue here is July 1, 2009 to June 30, 2010.

§ 22-8-25(A) (defining SEG distribution as "that amount of money distributed to each school district to ensure that its operating revenue, including its local and federal revenues . . . , is at least equal to the school district's program cost"). One hundred percent of a district's program cost is guaranteed by the SEG distribution formula.

{4}     A district's program cost is calculated by first establishing an "instructional unit count" for the district. The instructional unit count is based on actual student membership plus consideration of factors related to special categories of needs of the district. Such categories include "early childhood education, grade levels of students, special education students, bilingual students, students considered to be at risk, district size and scarcity, growth factors and . . . instructional staff experience and training." The program cost is calculated by "multiplying the district's instructional units by a set dollar figure per unit . . . ." The unit value is set by the Department Secretary after the New Mexico Legislature appropriates funds for the fiscal year.

{5}     School districts provide program cost estimates, including proposed revenues and expenditures, to the Department which in turn submits them to the New Mexico Secretary of Finance and Administration. *See* § 22-8-12.1(C)(2); 6.20.2.7(A) NMAC. The Secretary of Finance and Administration sends an estimate of the total appropriation for school districts for the upcoming fiscal year to the Legislature.

Based on the estimate received, the Legislature then appropriates funds for the SEG distributions for the districts. After the legislative session, the Department holds budget workshops to apprise districts of new developments from the session and assist the districts in preparing budgets. Until actual revenue figures are known, the Department uses "budget placeholders" to account for anticipated revenue, including impact aid. An operating budget for each school district must be submitted to the Department by April 15, and each school board must fix its operating budget for the upcoming fiscal year by June 20. *See* §§ 22-8-6(A), -10(A). The Department must approve a school district's operating budget by July 1; the budget may be amended during the fiscal year. *See* § 22-8-11(A)(1), -12.

{6} Prior to June 30 of each fiscal year, the Department is required to disburse the SEG distribution, the calculation of which is based on "local and federal revenues . . . received from June 1 of the previous fiscal year through May 31 of the fiscal year for which the [SEG distribution] is being computed." Section 22-8-25(G). Because school districts must budget for each coming fiscal year, the budget process requires estimating the SEG distribution for each district prior to the start of the fiscal year. According to the Department, school districts receive *preliminary* SEG distribution figures based on estimates obtained through the budget process.

{7}     The preliminary SEG distribution figure for each school district is divided into twelve monthly payments that may change based on information obtained from the district throughout the year. Adjustments to a district's preliminary SEG distribution figure may be required due to the addition of a new source of revenue or a change in student counts, for example. Although the Department is not required to distribute SEG funds until the end of the fiscal year (June 30), the Department provides the distribution in monthly payments starting at the beginning of the fiscal year so that school districts may use those funds to operate. The Department refers to these as "progress payments." The Department maintains that the preliminary SEG distribution figure on which the monthly progress payments—that is, SEG distribution payments—are based may not accurately reflect the final SEG distribution amount that the district receives at the end of the year. This, the Department maintains, is because it is not until May 31 that actual local and federal revenues of a district are known and the SEG distribution is calculated. Once the actual revenues are known, the Department provides the district with a final SEG distribution payment that is the difference between the actual SEG distribution to which the district is entitled and the monthly SEG distribution payments that were made to the district over the course of the fiscal year, including any advances.

{8}     In addition to state funding, some districts receive supplemental federal money known as "PL 874 funds" or "impact aid" under the Impact Aid Act. *See* 20 U.S.C. §§ 7701-7714; § 22-8-25(C)(2). The federal impact aid program "provides financial assistance to local school districts whose ability to finance public school education is adversely affected by a federal presence." *Zuni*, 550 U.S. at 84. This federal funding is provided for school districts "where a significant amount of federal land is exempt from local property taxes, or where the federal presence is responsible for an increase in school-aged children (say, of armed forces personnel) whom local schools must educate," *id.* at 84-85, such as military bases and Indian reservation lands. *See Zuni I*, 2012-NMCA-048, ¶ 4. Generally, a state receiving impact aid is not allowed to reduce state funding to a district based upon the district's receipt of impact aid. *See Zuni*, 550 U.S. at 85; *see also* 20 U.S.C. § 7709(a)(2) ("[A] State may not make [State funds] available to [school districts] in a manner that results in less State [funds] to [a school district] that is eligible for [impact aid] than such [school district] would receive if such [school district] were not so eligible.").

{9}     Congress created an exception, however, that allows a state to reduce the amount of state funding provided to a district receiving impact aid if the DOE Secretary determines and certifies that the state has a program in effect, such as New

Mexico's public school funding formula, that "equalizes expenditures for free public education among [school districts] in the State." 20 U.S.C. § 7709(b)(1). States intending to reduce funding to districts receiving impact aid must apply to the federal government for certification every fiscal year. *See* 20 U.S.C. § 7709(c)(1)(A) ("Any State that wishes to consider [impact aid payments] in providing State [funds] to [school districts] shall submit to the [DOE Secretary], not later than 120 days before the beginning of the State's fiscal year, a written notice of such State's intention to do so."). Certification from the DOE Secretary allows New Mexico to reduce state funding to a district in an amount equal to seventy-five percent of the impact aid received by the district. *See* § 22-8-25(C)(2), (D)(5), (D)(6).

{10}    The preliminary SEG distribution for an impacted district is the district's estimated program cost, which includes impact aid payments anticipated to be received by the district. The final SEG distribution is the actual program cost calculated at the end of the fiscal year, which includes impact aid payments actually received by the district. Generally, the total SEG distribution payments to which an impacted district is entitled for the fiscal year equals the district's program cost minus a deduction for seventy-five percent of impact aid payments received by the district.

**B.    Procedural History**

7

{11} Zuni, located within the Zuni Indian Reservation, also known as Zuni Pueblo, receives federal impact aid for which the State reduces funding to the district in the amount of seventy-five percent of impact aid received. For fiscal year 2010, Zuni's preliminary SEG distribution was estimated at approximately $10.5 million, which, divided into twelve monthly payments, equals $875,000 a month. From July 2009 through March 2010, the Department provided Zuni with monthly SEG distribution payments typically ranging from $400,000 to $490,000, reducing each monthly payment by roughly one-half the amount Zuni was entitled under the preliminary SEG distribution figure. The State was not certified by the DOE Secretary as having a properly equalized funding program until April 26, 2010, ten months after the Department's monthly payments for the fiscal year began.

{12} On April 30, 2010, Zuni filed a petition for writ of mandamus with the district court seeking declaratory and injunctive relief alleging that the Department was unlawfully deducting anticipated impact aid payments from Zuni's monthly SEG distribution payments prior to the State receiving certification to do so, resulting in significantly lower monthly payments to Zuni. Zuni requested the district court compel the Department to pay Zuni its proper share of monthly SEG distribution payments, stop making deductions based on anticipated impact aid, pay interest on

funds improperly retained, and certify the case as a class action suit for all districts similarly situated. The Department filed a motion to dismiss, alleging that sovereign immunity barred Zuni's complaint, that the district court lacked subject matter jurisdiction, that Zuni's complaint failed to state a claim upon which relief could be granted, that mandamus was not an appropriate remedy, and that a class action suit was improper. The district court held a hearing and denied the Department's motion to dismiss. The district court certified the issues for immediate review, and the Department filed an application for interlocutory appeal. The Court of Appeals granted interlocutory review and treated the application as a petition for writ of error on the issue of sovereign immunity. *Zuni 1,* 2012-NMCA-048, ¶ 2. The Department argued two points: (1) "Zuni's claim is based on a federal statute and that, therefore, the State retains constitutional sovereign immunity from suit in its own state courts" and (2) "Zuni's action for money damages is barred by the State's common law sovereign immunity." *Zuni 1*, 2012-NMCA-048, ¶ 7. The Court of Appeals rejected both arguments finding Zuni's arguments were based in state law, stating, "[I]t is the State's adherence to the Legislature's directives and the formula set out in Section 22-8-25 that provides the fulcrum for deciding this issue." *Zuni 1*, 2012-NMCA-048, ¶16. The Court of Appeals also found no basis in case law or statute to bar Zuni's

suit for money damages. *Id.* ¶ 21. Though the Court of Appeals discussed the impact aid program in its decision to provide context to its decision on sovereign immunity, it did not make a ruling on the underlying issue of whether the Department could offset payments before receiving certification. The case was remanded to the district court May 16, 2012.

{13}     The Department filed a petition for writ of certiorari which this Court denied. This Court also denied the Department's motion for rehearing. The case was remanded to the district court on mandate from the Court of Appeals. On November 5, 2013, the Department moved for summary judgment; Zuni filed a cross-motion for partial summary judgment on March 31, 2014. On July 28, 2014, the district court granted the Department's motion and denied Zuni's motion. The district court found that the Department's deduction of anticipated impact aid payments from Zuni's SEG distribution payments prior to certification was authorized under state law because certification was ultimately issued before the end of the fiscal year and concluded that the Department could make deductions for the entire fiscal year including *retroactive* deductions for impact aid payments received prior to the DOE Secretary's certificate.

{14}     Zuni appealed the district court's decision to the Court of Appeals. The Court of Appeals reversed the district court, holding that the deductions made by the

Department were not authorized under state or federal law. *Zuni Pub. Sch. Dist., No. 89 v. N.M. Pub. Educ. Dep't*, 2017-NMCA-003, ¶¶ 17-21, 386 P.3d 1020 (*Zuni II*). Specifically, the Court of Appeals held that the Department improperly deducted anticipated impact aid payments prior to the State's certification from the DOE Secretary. *Id.* ¶ 19. The Court of Appeals also held that once certified, the Department could only deduct for those payments received in the months after certification was obtained, noting that "nothing . . . allows for a 'retroactive' deduction after the DOE Secretary issues its certificate." *Id.*

{15} The Department filed a petition for writ of certiorari with this Court raising three issues: (1) whether the claims brought by Zuni for money damages are barred by state constitutional sovereign immunity, (2) whether the Court of Appeals erred in concluding that the offset taken by the Department for impact aid payments received by Zuni in fiscal year 2010 was not authorized by the Public School Finance Act, §§ 22-8-1 to -48, and (3) whether the Court of Appeals erred in concluding that the offset taken by the Department for impact aid payments received by Zuni in fiscal year 2010 was not authorized by Section 7709 of the federal Impact Aid Act. We granted certiorari on questions two and three pursuant to Rule 12-502 NMRA. In this opinion, we do not revisit the Department's sovereign immunity claims because they

11

were properly resolved by the Court of Appeals in *Zuni I*, 2012-NMCA-048. We address only the issues pertaining to the Department's deduction of impact aid payments from Zuni's SEG distribution payments in fiscal year 2010.

**II.    DISCUSSION**

**A.    Standard of Review**

{16}    We review the district court's grant of the Department's motion for summary judgment de novo. *See Tafoya v. Rael*, 2008-NMSC-057, ¶ 11, 145 N.M. 4, 193 P.3d 551. We are presented with a question of law, as the material facts of the case are not in dispute. *See Zuni II*, 2017-NMCA-003, ¶ 8. "Under this standard of review, we step into the shoes of the district court . . . as if we were ruling on the motion in the first instance." *Farmington Police Officers Ass'n v. City of Farmington*, 2006-NMCA-077, ¶ 13, 139 N.M. 750, 137 P.3d 1204.

{17}    We are also called upon to interpret the Public School Finance Act and the federal Impact Aid Act. Like the review of a grant of summary judgment, questions of statutory interpretation are reviewed de novo. *See Moongate Water Co., Inc. v. City of Las Cruces*, 2013-NMSC-018, ¶ 6, 302 P.3d 405.

{18}    "When construing statutes, our guiding principle is to determine and give effect to legislative intent." *Baker v. Hedstrom*, 2013-NMSC-043, ¶ 11, 309 P.3d 1047

(internal quotation marks and citation omitted). *See State v. Johnson*, 2001-NMSC-001, ¶ 6, 130 N.M. 6, 15 P.3d 1233 ("The starting point in every case involving the construction of a statute is an examination of the language utilized by the Legislature in drafting the pertinent statutory provisions.") (alteration, internal quotation marks, and citation omitted). "We use the plain language of the statute as the primary indicator of legislative intent." *Baker*, 2013-NMSC-043, ¶ 11 (alteration, internal quotation marks, and citation omitted). "We will not read into a statute language which is not there, especially when it makes sense as it is written." *State v. Hubble*, 2009-NMSC-014, ¶ 10, 146 N.M. 70, 206 P.3d 579 (citation omitted).

**B.     The Department, in Violation of the Public School Finance Act and the Federal Impact Aid Act, Unlawfully Deducted Federal Impact Aid Payments Anticipated to be Received by Zuni from SEG Distribution Payments Owed to Zuni Before the DOE Secretary Certified that a Deduction was Permissible**

{19}     The Public School Finance Act defines SEG distribution as "that amount of money distributed to each school district to ensure that its operating revenue, *including its local and federal revenues* as defined in this section, is at least equal to the school district's program cost." Section 22-8-25(A) (emphasis added). As applied here, the Public School Finance Act defines "federal revenue" as

> seventy-five percent of grants from the federal government as assistance to those areas affected by federal activity authorized *in accordance with*

13

Title 20 of the United States Code, commonly known as "PL 874 funds" or "impact aid[."]

Section 22-8-25(C)(2) (emphasis added). In calculating the SEG distribution for a district, the Department is required to calculate and deduct from the distribution seventy-five percent of federal revenues (impact aid payments) authorized "in accordance with Title 20 of the United States Code." *Id.*; *see also* § 22-8-25(D)(5), (6) (providing for the calculation and deduction of local and federal revenues as defined by the Public School Finance Act).

{20}    Here, "Title 20" means Section 7709 of the federal Impact Aid Act. Section 7709 forms the backdrop for how we interpret Section 22-8-25(C) of our Public School Finance Act. Section 7709 does not allow a state to take into consideration impact aid payments in allocating funds to a district unless the DOE Secretary "determines, and certifies . . . that the State has in effect a program of State aid that equalizes expenditures for free public education among [school districts] in the State." 20 U.S.C. § 7709(b)(1). Section 7709 further addresses treatment of state aid as follows:

> If a State has in effect a program of State aid for free public education
> for any fiscal year, which is designed to equalize expenditures for free
> public education among the [school districts] of that State, [impact aid]
> payments . . . for any fiscal year may be taken into consideration by such
> State in determining the relative . . . (A) financial resources available to

14

[school districts] in that State; and (B) financial need of such [school districts] for the provision of free public education for children served by such [school district] . . . .

20 U.S.C. § 7709(d)(1). Section 7709 contains a clear prohibition: "A State may not take into consideration [impact aid] payments . . . *before* such State's program of State aid has been certified by the [DOE] Secretary . . . ." 20 U.S.C. § 7709(d)(2) (emphasis added).

{21} Accordingly, the plain language of Section 7709 prohibits the State from taking into consideration "federal revenue"—that is, a district's impact aid payments—and deducting seventy-five percent of that amount from the district's SEG distribution until the State receives certification from the DOE Secretary. Section 22-8-25(C) of the Public School Finance Act clearly and unambiguously incorporates this federal requirement. *See* § 22-8-25(C)(2) (defining "federal revenue" as "seventy-five percent of grants . . . authorized in accordance with Title 20 of the United States Code"). *See also State v. Smith*, 2004-NMSC-032, ¶ 10, 136 N.M. 372, 98 P.3d 1022 ("A statutory subsection may not be considered in a vacuum, but must be considered in reference to the statute as a whole and in reference to statutes dealing with the same general subject matter." (alteration, internal quotation marks, and citation omitted)).

15

{22}     While the language is clear that certification must be issued before a state may consider impact aid payments, Section 7709 is arguably ambiguous as to the meaning of "payments."  *See* § 7713, "Definitions" (providing no definition of "payments" under the Impact Aid Act); § 7709(a)(1) ("[A] State may not . . . consider *payments* under this subchapter in determining . . . (A) the eligibility of a [school district] for State aid for free public education; or (B) the amount of such aid . . . ." (emphasis added)); § 7709 (b)(1) ("A State may reduce State aid to a [school district] that *receives a payment . . . .*" (emphasis added)).  In fact, this ambiguity is the crux of the Department's argument.  The Department argues that the word "payments" in Section 7709 does not contemplate funds *anticipated* to be received, but only funds *actually* received, thereby excluding anticipated impact aid payments from the purview of the Public School Finance Act and Impact Aid Act.

{23}     In furtherance of this argument, the Department refers to preliminary SEG distributions as mere "estimates" because the true SEG distribution is not calculated until the end of the fiscal year when actual revenues are known.  *See* § 22-8-25(G) (providing that the SEG distribution calculation is based on "local and federal revenues . . . received from June 1 of the previous fiscal year through May 31 of the fiscal year for which the [SEG] distribution is being computed").  Thus, the

Department asserts that Zuni's impact aid payments could not have been *considered*, or a final calculation done, prior to May 31, after Zuni's impact aid was received and certification was issued.

{24} The Department also suggests that the reduction of monthly SEG distribution payments to Zuni is a result of factors pertaining to the budget process itself, not necessarily a premature deduction of impact aid funds. To this end, the Department reminds us that budgets are modified throughout the year because of changes in costs, revenues, student counts, and other factors. The Department further notes that a decrease in funding was mandated by the Legislature in the special session held in fiscal year 2010, resulting in a reduction in funding to all districts that year. As explained below, we find the Department's arguments unavailing.

{25} For fiscal year 2010, Zuni's preliminary SEG distribution was estimated at approximately $10.5 million. Divided by twelve, Zuni should have received monthly SEG distribution payments of $875,000 a month. Instead, the Department took into consideration $6.2 million in impact aid it anticipated Zuni would receive and deducted seventy-five percent, approximately $4.6 million, from Zuni's preliminary SEG distribution, prior to the State receiving its certification. From July 2009 through March 2010, the Department provided Zuni with monthly SEG distribution

17

payments ranging from $400,000 to $490,000. To make matters worse, Zuni did not actually receive any federal impact aid payments until very late in the fiscal year, January and March 2010. This left Zuni sorely underfunded during the vast majority of the school year. In fact, Zuni requested and received emergency funding from the Department in the amount of $500,000 in December of 2009 because it could not meet its program cost. Furthermore, the State was not certified by the DOE Secretary as having a properly equalized funding program until April 26, 2010, ten months after the Department began its monthly pro-rata reduction of funds to Zuni.

{26}     While we understand that the budget process calls for inclusion of anticipated impact aid in the preliminary SEG distribution calculation, we simply cannot agree that these monthly SEG distribution payments are just "estimates," and not within the purview of the plain language of the Section 22-8-25 of the Public School Finance Act and Section 7709 of the Impact Aid Act. While the word "payments" may be ambiguous, the intent of Section 7709 is clear. The State may not take into consideration impact aid payments, whether anticipated or actually received, prior to obtaining certification from the DOE Secretary. This means that the Department may not reduce SEG distribution payments to an impacted district prior to certification. "[I]f the plain meaning of the statute is doubtful, ambiguous, or if an adherence to the

18

literal use of the words would lead to injustice, absurdity or contradiction, we will construe the statute according to its obvious spirit or reason." *Baker*, 2013-NMSC-043, ¶ 11 (alteration, internal quotation marks, and citation omitted). "We will not construe a statute to defeat its intended purpose." *Id.* ¶ 21 (alteration, internal quotation marks, and citation omitted).

{27}     The monthly SEG distribution payments are the State's primary source of funding for the districts. They are not merely "estimates," but actual, tangible funds paid to the districts throughout the year to enable the districts to operate. As noted above, Zuni was deprived of the use of approximately $4.6 million over ten months because the Department took into consideration anticipated impact aid prior to the State obtaining certification.

{28}     Allowing the Department to take into consideration impact aid is an exception to the rule and a process that must be adhered to precisely. It cannot be reasoned that in restricting reductions of state funding to districts receiving impact aid, the federal government intended for states to circumvent the restrictions by calling their deductions "estimates." The Department may not take into consideration federal impact aid payments, anticipated or actually received, until the State has received its certification from the DOE Secretary. *See Zuni II*, 2017-NMCA-003, ¶ 18.

{29} We note, however, that under new federal regulations, a state may consider impact aid prior to certification if a state has received special permission from the DOE Secretary. *See* 34 C.F.R. § 222.161(a)(6)(i) (2016) ("If the [DOE] Secretary has not made a determination [under Section 7709] for a fiscal year, the State may request permission from the Secretary to make estimated or preliminary State aid payments for that fiscal year, that consider a portion of Impact Aid payments . . . in accordance with this section."). Although these regulations were not in effect during the 2010 fiscal year, we acknowledge that the State shall have this option going forward.

{30} We do recognize that if certification is issued late in the fiscal year, as occurred here, Zuni and other impact aid districts may have to refund potentially large sums of money to the state general fund, rather than to the Department for use in other districts. *See* § 22-8-25(G) (providing that a school district that receives more SEG distribution funds than it is entitled must refund the overpayment to the state general fund). The Department has indicated this may be problematic for the budgeting process because these overpaid funds will not be available for redistribution to non-impacted districts. Although we recognize the Department's concern, we are compelled to follow the plain language of the law. Under the Public School Finance Act, the Department shall take a deduction for seventy-five percent of federal impact

aid funds "*authorized in accordance with* Title 20." Section 22-8-25(C)(2) (emphasis added) (referring to Section 7709). Funds are not authorized under Section 7709 until there is certification. That any overpayment of funds is to be directed to the general fund is a result dictated by current law and is one that we leave to the discretion of our Legislature.

**C.** **Once Certified by the DOE Secretary, the Department was Authorized to Make Deductions for Federal Impact Aid Payments Zuni Received for the Entire 2010 Fiscal Year**

{31}   Zuni contends that Section 7709 allows a deduction only for those impact aid payments received after certification, not for payments received earlier in the fiscal year. *See Zuni II*, 2017-NMCA-003, ¶ 19 ("There is nothing in the SEG or Title 20 of the United States Code that allows for a 'retroactive' deduction after the DOE Secretary issues its certificate."). Zuni argues that the prohibition contained in Section 7709(d)(2), that a "State may not take into consideration payments under this subchapter before such State's program of State aid has been certified by the [DOE] Secretary," dictates that the Department may not take a deduction for impact aid payments received by Zuni in the months preceding certification, even after certification is obtained. This means the Department, although certified for the entire fiscal year, would not have been able to consider impact aid payments received by

21

Zuni in January and March 2010, as the State did not receive its certification until April 26, 2010. We disagree. The prohibition contained in Section 7709(d)(2) must be read in conjunction with Section 7709(d)(1):

> If a State has in effect a program of State aid for free public education for *any fiscal year*, which is designed to equalize expenditures for free public education among the [school districts] of that State, payments under this subchapter for *any fiscal year* may be taken into consideration by such State . . . .

(emphasis added). "[W]e must construe each part of the [statute] in connection with every other part so as to produce a harmonious whole." *Sundance Mechanical & Util. Corp. v. Armijo*, 1987-NMSC-078, ¶ 5, 106 N.M. 249, 741 P.2d 1370 (citation omitted). Section 7709(d)(1) is clear that impact aid payments made "for any fiscal year" may be considered by the Department. Nothing in Section 7709(d)(1) limits consideration to payments made in the months following certification.

{32} The DOE Secretary certified that New Mexico was "eligible to take into consideration Impact Aid payments in determining State aid to [school districts]" for the period of July 1, 2009 to June 30, 2010. The certification period was for the entire fiscal year 2010. When the State was issued this certification on April 26, 2010, the Department was authorized to take into consideration impact aid payments made to Zuni in January and March 2010.

**D.     Zuni Received Its Full SEG Distribution for Fiscal Year 2010**

{33}     Exhibits submitted to the Court indicate that Zuni's final SEG distribution was approximately $9.9 million, about $600,000 less than the preliminary SEG distribution figure.  Neither party contests the final distribution amount, as both acknowledge that a difference like this is not unusual.  In fact, many factors contribute to the need for an adjustment to the SEG distribution at the end of the fiscal year.  For example, the $500,000 emergency aid granted to Zuni in December of 2009 was properly deducted from the preliminary SEG distribution figure and accounts for a majority of the difference here.  This Court takes no position on the preliminary or final SEG distribution figures, as the funding formula itself is not at issue in this case.

{34}     After the Department's deduction of approximately $4.8 million[2] for impact aid payments from the final SEG distribution of $9.9 million, Zuni received a total of approximately $5.3 million in SEG distribution payments during fiscal year 2010.  Although Zuni was entitled to the use of its full SEG distribution payments prior to the State's certification by the DOE Secretary, Zuni actually received approximately $217,000 more from the Department in SEG distribution payments in fiscal year 2010

---

[2]Zuni was anticipated to receive $6.2 million in impact aid, but actually received $6.4 million.  Seventy-five percent of $6.4 million equals $4.8 million.

than it was entitled.[3]  Under Section 22-8-25(G), Zuni is required to refund this overpaid sum to the state general fund.

**III.   CONCLUSION**

{35}    The Department erred in deducting anticipated impact aid payments from its monthly SEG distribution payments to Zuni prior to certification.  Once the Department was certified, however, the Department was authorized to make deductions for impact aid payments received by Zuni for the entire fiscal year.  Exhibits submitted to the Court indicate that Zuni received its full SEG distribution for fiscal year 2010.  Therefore, Zuni's request for additional SEG distribution funds and retention of full impact aid payments is hereby denied.  The district court's grant of summary judgment to the Department is affirmed.

{36}    Going forward, the Department's monthly SEG distribution payments to a district shall be based upon the preliminary SEG distribution figure without taking into consideration a district's impact aid (anticipated or received), until federal certification has been issued to the State by the DOE Secretary or the DOE Secretary has granted the State permission to consider impact aid prior to certification.  Only then shall the Department take into consideration impact aid in its calculation of

---

[3]See Appendix for SEG distribution payment calculation.

monthly SEG distribution payments to a district.

{37}    **IT IS SO ORDERED.**

_____
                    **PETRA JIMENEZ MAES, Justice**

**WE CONCUR:**

_____
**JUDITH K. NAKAMURA, Chief Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**CHARLES W. DANIELS, Justice**

_____
**BARBARA J. VIGIL, Justice**

| ZUNI SEG DISTRIBUTION PAYMENT CALCULATION FISCAL YEAR 2009-2010 | |
| --- | --- |
| Final SEG distribution = | $ 9,911,814.80 |
| SEG distribution payments received = | $ 5,322,038.59 |
| Impact aid received = | $ 6,409,522.80 |
| 75% of impact aid received = | $ 4,807,142.10 |
| Final SEG distribution minus 75% of impact aid received = | $ 5,104,672.70 (Zuni's entitlement under the SEG formula) |
| SEG distribution payments received minus Zuni's entitlement under the SEG formula = | $ 217,365.89 (Department's overpayment to Zuni) |