The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number:

Filing Date: April 21, 2025

**NO. S-1-SC-40162**

**KATE FERLIC, as the Personal Representative of the Wrongful Death Estate of I.B-R, a deceased minor, CARISSA BREALEY, individually and as the Guardian and Next Friend of K.B.R., a minor, JAMES ROOD, individually and AIDAN BREALEY-ROOD, individually,**

Plaintiffs,

v.

**MESILLA VALLEY REGIONAL DISPATCH AUTHORITY, DANIEL GUTIERREZ, DAVID WOODWARD and QUINN PATTERSON, individually and as Mesilla Valley Regional Dispatch officers and employees, DOÑA ANA COUNTY BOARD OF COUNTY COMMISSIONERS, ARTURO HERRERA, individually and as Doña Ana County officer and employee, ADRIAN HERRERA, individually and as Doña Ana County officer and employee, NEW MEXICO DEPARTMENT OF PUBLIC SAFETY, and CITY OF LAS CRUCES,**

Defendants.

**CERTIFICATION FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW MEXICO**
**David Herrera Urias, United States District Judge**

McGraw Law, LLC
Mollie C. McGraw
Las Cruces, NM

for Plaintiffs


Mason & Isaacson, P.A.
Thomas Lynn Isaacson
Gallup, NM

for Defendants Mesilla Valley Regional Dispatch Authority, Daniel Gutierrez, David Woodard, and Quinn Patterson

Law Office of Michael Dickman
Michael Dickman
Santa Fe, NM

for Defendant New Mexico Department of Public Safety

**OPINION**

**VIGIL, Justice.**

{1}     This matter comes to us by way of a certified question from the United States District Court for the District of New Mexico pursuant to Rule 12-607 NMRA. The certification arises due to a perceived conflict in our statutes governing the liability of a 911 dispatcher (hereinafter 911 dispatcher or emergency medical dispatcher, depending upon the context). On the one hand, the Enhanced 911 Act, NMSA 1978, §§ 63-9D-1 to -11.1 (1989, as amended through 2017), provides immunity to those covered by its provisions "except for intentional acts." Section 63-9D-10. On the other hand, the Enhanced Medical Services Act (EMSA), NMSA 1978, §§ 24-10B-1 to -13 (1983, as amended through 2023), as implemented by the New Mexico Tort Claims Act (NMTCA), NMSA 1978, §§ 41-4-1 to -27 and 41-4-30 (1976, as amended through 2020),[1] provides for immunity for those covered by its provisions except for damages caused by negligence. *See* §§ 24-10B-5, -8; § 41-4-10. As framed by the federal district court, the certified question reads: "Considering the Enhanced 911 Act . . . and the [EMSA], are 911 dispatchers immune from liability for negligence under the [NMTCA]?"

---

[1]Section 41-4-30 was explicitly enacted as a "new section of the Tort Claims Act." 2010 N.M. Laws, ch. 22, § 1.

{2}     Exercising our discretion to reformulate the question, *see* Rule 12-607(C)(4), and "limit[ing] our answer to the context of this case," *Spurlock v. Townes*, 2016-NMSC-014, ¶ 11, 368 P.3d 1213, we examine the impact, if any, the Enhanced 911 Act has on the liability of the 911 dispatchers—and the agencies that employ them—who are alleged to have been negligent in responding to the 911 emergency medical calls underlying this proceeding. Viewing the question in this light, our answer is as follows: the immunity provision set out in Section 63-9D-10 of the Enhanced 911 Act has no bearing on the 911 dispatchers' immunity from liability for the allegedly mishandled 911 emergency medical calls; instead, the immunity issue is ultimately governed—one way or the other—by the liability provision of Section 24-10B-8 of the EMSA. Before undertaking our legal analysis, we recite the relevant facts and procedural history of the case.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

{3}     The wrongful death and related claims giving rise to this lawsuit stem from the tragic death of sixteen-year-old minor I.B-R.[2] I.B-R, along with his mother (Mother) and brother, was hiking on a warm summer morning in the Organ Mountains of Doña Ana County, New Mexico, when I.B-R became seriously ill.

---

[2]The facts are taken from Plaintiffs' first amended complaint and the certification order issued by the federal district court.

Stumbling and losing his balance, I.B-R was unable to hike back to the family car that was parked at the trailhead. Mother called 911, requesting immediate medical assistance. The emergency medical call was answered by a 911 dispatcher employed by Defendant Mesilla Valley Regional Dispatch Authority (MVRDA) and was routed digitally to Defendant New Mexico Department of Public Safety (DPS) by way of a Computer-Aided Dispatch (CAD) system that allows information about an emergency 911 call to be "see[n] and access[ed]" by DPS dispatchers (collectively, the two agencies are hereinafter referred to as Defendants).

{4} Mother reported that I.B-R needed urgent help because he was overheated and unresponsive and that the two of them were stranded roughly three-quarters of a mile from the trailhead. More than an hour and twenty minutes later, and after Mother had called 911 a second time, members of the Las Cruces Fire Department reached I.B-R and brought him back to the trailhead. Despite the fire department's efforts and the series of medical interventions that ensued, I.B-R died the following day from multi-organ failure resulting from hyperthermia heat stroke.

{5} This litigation ensued. Plaintiffs, consisting of the personal representative of I.B-R's wrongful death estate and I.B-R's immediate family members, brought claims for wrongful death, lost chance of survival, spoliation of evidence, and loss

3

of consortium. The action was initially commenced in state district court and was subsequently removed to federal district court.

{6}      As here relevant, Plaintiffs' first amended complaint (FAC) primarily assigns fault to three identified MVRDA dispatchers for a series of delay-causing missteps allegedly made in responding to Mother's 911 emergency medical calls. Among the missteps alleged were failing to "adequately convey [information regarding I.B-R's] symptoms" to the county fire officials; incorrectly characterizing the nature of the emergency as both a "search and rescue" and a "minor medical" call; and inadvisably canceling two ambulance dispatches. But, as the federal district court discussed in its certification order, fault also may lie with the non-"synced" nature of the separate CAD systems operated by each of the Defendants, a factor which may explain in part why the CAD system operated by DPS "incorrectly noted that [Mother] and [I.B-R] were located three and a quarter . . . miles northbound of the trailhead, instead of three quarters . . . of a mile from the trailhead." That circumstance, the federal district court reasoned, may have dissuaded the emergency responders who were "casually gather[ed]" in the trailhead parking lot from "r[unning] or walk[ing] the trail in an [earlier] attempt to reach [I.B-R] and render necessary emergency aid."

{7}      Defendants separately moved to dismiss the FAC for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Each motion cited the

4

Enhanced 911 Act—not the EMSA—as a basis for dismissal. And each motion maintained that the allegations set out in the FAC sound in pure negligence and are thus barred by the immunity provision of Section 63-9D-10 of the Enhanced 911 Act which, as later discussed herein, exempts certain specified enhanced 911-related conduct from suit "except for intentional acts."

{8} Plaintiffs countered that there is no immunity for 911 dispatchers under the Enhanced 911 Act. Instead, Plaintiffs asserted that the EMSA applies to 911 dispatchers and, therefore, they can be sued under the NMTCA's negligence standard.

{9} Prompted by understandable uncertainty over New Mexico's statutory framework and adherence to comity, the federal district court issued its certification order in lieu of deciding Defendants' dismissal motions without this Court's input and stayed the matter pending this Court's answer to the certified question. We accepted the certification.

**II.    DISCUSSION**

**A.    General Principles of Statutory Construction**

{10} "When construing statutes, our guiding principle is to determine and give effect to legislative intent." *Baker v. Hedstrom*, 2013-NMSC-043, ¶ 11, 309 P.3d 1047 (internal quotation marks and citation omitted). "We use the plain language of

the statute as the primary indicator of legislative intent," *id.* (brackets, internal quotation marks, and citation omitted), adhering to the statutory language chosen by the Legislature without "read[ing] into a statute language which is not there, especially when it makes sense as it is written," *State Pub. Educ. Dep't v. Zuni Pub. Sch. Dist.*, 2018-NMSC-029, ¶ 18, 458 P.3d 362 (internal quotation marks and citation omitted). Where statutory language is doubtful or ambiguous, "we read the provisions at issue in the context of the statute as a whole, including its purposes and consequences." *Lujan Grisham v. Romero*, 2021-NMSC-009, ¶ 23, 483 P.3d 545 (internal quotation marks and citation omitted); *accord Rutherford v. Chaves Cnty.*, 2003-NMSC-010, ¶ 24, 133 N.M. 756, 69 P.3d 1199 ("Statutes are to be read in a way that facilitates their operation and the achievement of their goals."), *abrogated on other grounds as recognized by Belen Cons. Sch. Dist. v. Cnty. of Valencia*, 2019-NMCA-044, ¶ 9, 447 P.3d 1154, *aff'd sub nom. Nash v. Bd. of Cnty. Comm'rs*, 2021-NMSC-005, 480 P.3d 842. Additional and more specific rules of statutory construction come into play and are discussed below.

**B.    Defendants' Misplaced Reliance on the Immunity Provision Contained in Section 63-9D-10 of the Enhanced 911 Act**

{11}    The Enhanced 911 Act, enacted in 1989 and codified in the "Railroads and Communications" chapter of our statutes, was designed, among other reasons, to promote "faster response time" in emergency situations by "enabling the

development, installation and operation of enhanced 911 emergency reporting systems" and to ensure that "adequate funding [be made] available" for that salutary purpose. Section 63-9D-2(A)(4)(b), (A)(5), (B). Our Legislature thoroughly addressed these dual considerations—the "development, installation and operation" of enhanced 911 infrastructure and the provision of the necessary funding to do so— throughout the body of the statute. *See* § 63-9D-2(A)(5), (B); *see also, e.g.*, § 63-9D-3(M) (defining an *enhanced 911 system* as including "a landline, wireless, NG-911 or ESInet system consisting of network switching equipment, database, mapping and on-premises equipment"); § 63-9D-2(A)(4)(c) (providing that an enhanced 911 system "automatic[ly] rout[es]" an emergency call "to the appropriate emergency response unit"); § 63-9D-4(A) (encouraging the provision of enhanced 911 services by local governing bodies, individually or in "consortium," by authorizing them to "incur costs for the purchase, lease, installation or maintenance of enhanced 911 equipment and training necessary for the establishment of an enhanced 911 system"); § 63-9D-8(A), (E) ("[C]reat[ing] in the state treasury [an] . . . enhanced 911 fund" to be used by local governing bodies, with the requisite approval, "for administering and coordinating activities associated with implementation of the Enhanced 911 Act.").

{12}     In essence, the Enhanced 911 Act serves as a roadmap for the installation and operation of potentially lifesaving but costly technology-driven emergency response hardware, software, and infrastructure by local governmental entities. Notable for its absence from the statute is any language addressing the role served or job duties assumed by a 911 dispatcher in the enhanced 911 process—be it in the medical emergency call realm or otherwise. Indeed, the Legislature saw fit to include within the statute only two isolated references to what fairly can be read to be the functional equivalent of a 911 dispatcher—assigning the term *public safety answering point call-taker*—and confining each such reference to the statute's definitional section. *See* § 63-9D-3(A), (L).

{13}     Against this statutory backdrop, we examine the immunity provision set out in the version of Section 63-9D-10 in effect at all relevant times herein. In its entirety, the section reads as follows:

> Enhanced 911 systems are within the governmental powers and authorities of the local governing body or state agency in the provision of services for the public health, welfare and safety. In contracting for such services or the provisioning of an enhanced 911 system, *except for intentional acts*, the local governing body, public agency, equipment supplier, communications service provider and their officers, directors, vendors, employees and agents are not liable for damages resulting from installing, maintaining or providing enhanced 911 systems or transmitting 911 calls.

Section 63-9D-10 (emphasis added).

{14}     Defendants read the immunity section broadly so as to include emergency medical dispatchers. In doing so, Defendants' briefing focuses exclusively on the final disjunctive clause of the section's text, urging that the phrase *transmitting 911 calls* is alone sufficient to "make[] clear" that 911 dispatchers are "subject to the [Act's] grant of immunity." As will be shown, this all-too-broad interpretation of the Enhanced 911 Act's immunity provision falters on multiple levels.

{15}     To begin, Defendants' argument ignores the commonsense principle of statutory construction that a legislative body "does not alter the fundamental details of a [statutory] scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001). Succinctly stated, important changes in statutory law are not generally made through inconspicuous means. Applying that principle here, we cannot conclude that the Legislature would announce a new rule more broadly immunizing 911 dispatchers from liability except for intentional acts in the space of one phrase in a statute primarily addressing enhanced 911 infrastructure and funding that makes only isolated and generalized references to 911 dispatchers or their equivalents.

{16}     This is particularly so in view of the chronology of the Enhanced 911 Act and the EMSA. The Enhanced 911 Act was enacted a scant six years after the passage

of the EMSA, a statute whose purpose is to "regulate" the operation of "a comprehensive emergency medical services system in the state," § 24-10B-2, and whose provisions lay out in clear and comprehensive terms both the job duties and licensing requirements of what it plainly characterizes as an "emergency medical dispatcher." *See* § 24-10B-3(J) (defining the term to mean "a person who is trained and licensed pursuant to [the statute] to receive calls for emergency medical assistance, provide pre-arrival medical instructions, dispatch emergency medical assistance and coordinate its response"); § 24-10B-4(F) (requiring the "adoption of rules pertaining to the training and licensure of emergency medical dispatchers and their instructors").

{17}  In addition, and important for our purposes, the liability section of the EMSA provides as follows:

> In any claim for civil damages arising out of the provision of emergency medical services by personnel described in Section 24-10B-5 . . . , *those personnel shall be considered health care providers for purposes of the* [*NMTCA*] if the claim is against a governmental entity or a public employee as defined by that act.

Section 24-10B-8 (emphasis added). Inasmuch as the term "emergency medical dispatcher" is prominently included among the array of emergency medical service personnel described in Section 24-10B-5 and considering that health care providers are among the public employees subject to suit under the waiver of immunity

10

provisions of the NMTCA, *see* § 41-4-10, the statutory language quoted above can only be read as extending a waiver of immunity to tort claims involving emergency medical dispatchers. That being so, we are not inclined to believe that the Legislature—not long after its passage of the EMSA—would revisit the narrow topic of dispatcher-related liability/immunity in formulating and enacting the Enhanced 911 Act and, in the process, treat the subject matter with far less clarity the second time around than it did the first.

{18}     Our skepticism that the Legislature purposefully chose to follow this incongruous path when it enacted the Enhanced 911 Act is only heightened by the Legislature's 2017 amendment to the Act that raised the immunity bar from a heightened negligence standard to an intentional standard. *See* § 63-9D-10 annot. (June 16, 2017) (indicating that the 2017 amendment "removed negligent acts as exceptions to the immunity provision" of the section). Were we to adopt Defendants' expansive reading of the immunity provision of Section 63-9D-10 of the Enhanced 911 Act, we would either have to read the section in isolation or assume that, in enacting and amending the statute, the Legislature intended to supplement and ultimately to repeal the counterpart liability provision of the EMSA.

{19}     In recently resolving a similar statutory dilemma, this Court rejected both of these options, noting that courts "do not read statutes in isolation" and that repeals

11

by implication require a "clear and manifest" legislative intent to replace a prior statute with a later one and "are not favored." *Coal. for Clean Affordable Energy v. N.M. Pub. Regul. Comm'n*, 2024-NMSC-016, ¶ 30, 549 P.3d 500 (internal quotation marks and citations omitted). And as this Court stated more than a century ago, repeals by implication are recognized only "where the last statute is so broad in its terms and so clear and explicit in its words as to show it was intended to cover the whole subject, and therefore, to displace the prior statute." *State ex rel. Cnty. Comm'rs v. Romero*, 1914-NMSC-023, ¶ 6, 19 N.M. 1, 140 P. 1069 (internal quotation marks and citations omitted). The cryptic immunity provision set out in Section 63-9D-10 of the Enhanced 911 Act is hardly sufficient to meet this stringent standard.

{20}   Lastly, just as courts resist reading statutes in isolation, so too are courts wary of reading selected snippets of a statute in isolation. *Samantar v. Yousuf*, 560 U.S. 305, 319 (2010) ("[W]e do not . . . construe statutory phrases in isolation; we read statutes as a whole." (omission in original) (internal quotation marks and citation omitted)); *see Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010) (recognizing that "[c]ourts have a duty to construe statutes, not isolated provisions" and cautioning courts against treating different categories of statutory language "as islands unto themselves" (internal

quotation marks and citation omitted)), *superseded by statute on other grounds as stated in Lyons Twp. ex rel. Kielczynski v. Vill. of Indian Head Park*, 2017 IL App (1st) 161574, ¶ 16, 84 N.E.3d 1118; *accord Key v. Chrysler Motors Corp.*, 1996-NMSC-038, ¶ 14, 121 N.M. 764, 918 P.2d 350 (stating that courts should read statutes "in [their] entirety and construe each part in connection with every other part to produce a harmonious whole"); *see also* 2A Norman J. Singer & Shambie Singer, *Sutherland Statutes and Statutory Construction* § 46.5 (7th ed. 2014) (labeling this approach "'[w]hole statute' interpretation").

{**21**}    Applying that principle here, it is far from clear that the phrase *transmitting 911 calls* that appears at the end of the immunity provision of Section 63-9D-10 and upon which Defendants so heavily rely was intended to encompass the work of 911 dispatchers. Given the Enhanced 911 Act's emphasis on communications infrastructure, a more plausible view is that the *transmitting 911 calls* language found in Section 63-9D-10 was meant to apply to malfunctions related to the "automatic routing [of 911 calls] to the appropriate emergency response unit" that is a required feature of enhanced 911 systems in New Mexico. Section 63-9D-2(4)(c). As Plaintiffs effectively summed it up in opposing the dismissal motion filed by Defendant MVRDA in the pending federal court proceedings: "[T]he Enhanced 911

13

Act should be construed to provide immunity only for those situations where there is some technical failure in the 911 system [itself]."

{22} To be clear, we do not question the wisdom of modernizing existing statutes to clarify the immunity status of purveyors, providers, and recipients of innovative technologies. We simply conclude that the Legislature did not intend the Enhanced 911 Act to serve as a vehicle to confer immunity on 911 dispatchers, save for intentional acts. Instead, as indicated above, the Legislature previously settled the immunity issue—at least with respect to emergency medical dispatchers—when it enacted the EMSA.

**C.      The Narrow Scope of Our Analysis**

{23} In the certification realm, this Court's task is complete when we provide an answer to a certified question that is "determinative in that it resolves the issue in the case out of which the question arose, and the resolution of this issue materially advances the ultimate termination of the litigation." *Schlieter v. Carlos*, 1989-NMSC-037, ¶ 4, 108 N.M. 507, 775 P.2d 709; *accord City of Las Cruces v. El Paso Elec. Co.*, 1998-NMSC-006, ¶ 24, 124 N.M. 640, 954 P.2d 72 ("Our goal in answering a question certified by the federal courts is not to finally dispose of all relevant issues in a case."). Our answer today—that the immunity provision found in Section 63-9D-10 of the Enhanced 911 Act plays no role in determining the

14

liability of either the 911 dispatchers involved in the tragic incident underlying this lawsuit or their governmental employers—fully resolves the immunity issue that fueled Defendants' motions to dismiss and gave rise to the certification order issued by the federal district court.

{24}    We have no occasion to engage in any further analysis—say, for example, by applying the liability provision contained in Section 24-10B-8 of the EMSA to the facts of this case. Notably, neither of the Defendants sought relief on the basis of that statute in the federal district court or presently ask this Court in their combined briefing to weigh in on the issue. Nor would the limited factual development of the federal district court record allow us to do so. Missing from the record, for example, is a proper showing that any of the 911 dispatchers implicated in the alleged mishandling of the 911 calls involved in this case met the licensure requirements necessary to qualify for work as an emergency medical dispatcher under Section 24-10B-5 of the EMSA. Even beyond these inhibiting factors, prudence counsels us to abstain from any further analysis so as to avoid venturing into advisory opinion territory. *See Schlieter*, 1989-NMSC-037, ¶ 4 (cautioning that "[a]voidance of advisory opinions" is essential to the proper handling of certification requests); *see also Allstate Ins. Co. v. Stone*, 1993-NMSC-066, ¶ 7, 116 N.M. 464, 863 P.2d 1085

(declining to decide unnecessary certified issues to avoid issuing an advisory opinion). Our analysis, therefore, ends here.

## III.   CONCLUSION

{25}   For the foregoing reasons, we conclude that the immunity provision of Section 63-9D-10 of the Enhanced 911 Act has no relevance in determining the potential liability of a 911 dispatcher for mishandling an emergency 911 call.

{26}   **IT IS SO ORDERED.**

_____

**MICHAEL E. VIGIL, Justice**

**WE CONCUR:**

_____

**DAVID K. THOMSON, Chief Justice**

_____

**C. SHANNON BACON, Justice**

_____

**JULIE J. VARGAS, Justice**

_____

**BRIANA H. ZAMORA, Justice**

16